#31100, #31144-aff in pt & rev in pt-PJD
**2026 S.D. 42**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

| | |
|---|---|
| VIVA CAPITAL TRUST, | Plaintiff and Appellee, |
| v. | |
| JERRY GARRETT, in his individual capacity and in his capacity as Special Administrator for the ESTATE OF FRANK GARRETT, JR., and the FRANK GARRETT, JR. 2006 IRREVOCABLE TRUST, dated April 7, 2006, | Defendants and Appellants. |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| JERRY GARRETT, an individual, as Special Administrator for the ESTATE OF FRANK GARRETT, JR., | Counterclaim-plaintiff and appellant, |
| v. | |
| VIVA CAPITAL TRUST, and WILMINGTON TRUST, N.A., as securities intermediary, | Counterclaim-defendants and appellees. |

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

THE HONORABLE DOUGLAS E. HOFFMAN
Retired Judge

ARGUED
MARCH 19, 2026
OPINION FILED **07/01/26**

NICOLAS NOVY
CHASE HOWARD
BENJAMIN KAMPF
GREGORY STAR of
COZEN O'CONNOR
Philadelphia, Pennsylvania

SHANNON FALON
COREY T. DENEVAN of
Denevan Falon Prof. LLC
Sioux Falls, South Dakota                    Attorneys for appellants.


KHAI LEQUANG
RICHARD W. KREBS
JORDAN JEKEL of
Orrick, Herrington &
    Sutcliffe, LLP
Irvine, California

ALEX HAGEN
STEPHEN C. LANDON of
Cadwell, Sanford, Deibert & Garry
Sioux Falls, South Dakota                    Attorneys for appellees.

#31100, #31144

DEVANEY, Justice

[¶1.]        In May 2022, Viva Capital Trust (Viva) commenced this declaratory judgment action against the Estate of Frank Garrett, Jr. (Estate), seeking a declaration that Viva was the rightful owner of a life insurance policy procured on Frank's life in 2006.  The Policy, initially owned by Frank's trust, was later sold in the secondary market to other entities, including Viva, which collected the $10 million death benefits payable under the Policy after Frank died in 2019.  The Estate, in its counterclaims, sought to disgorge the insurance proceeds from Viva under SDCL 58-10-5, which allows recovery of insurance benefits if a policy is made in violation of SDCL 58-10-3.  This statute prohibits someone from procuring a life insurance contract on the life of another unless, at the time the Policy was procured, the beneficiary has an insurable interest in the individual insured.  The Estate claimed the Policy was part of a stranger-originated life insurance (STOLI) scheme that violated South Dakota's insurable interest statute and was essentially an illegal wagering contract on Frank's life.  After engaging in considerable discovery, the parties filed cross-motions for summary judgment.  The circuit court entered summary judgment in favor of Viva and against the Estate, determining that the Policy was validly issued and that Viva was entitled to retain the Policy benefits because the Policy was procured in conformity with the governing statutes.  The Estate appeals the circuit court's order, as well as its order awarding taxable costs to Viva.

-1-

**Factual and Procedural Background**

[¶2.]		While some of the underlying facts in this case are disputed, most are not. With this caveat, we relate the following factual background, which is based primarily on written documentation and unrebutted deposition testimony. In late 2005, Frank Garrett, Jr., a 78-year-old California retiree, met Stewart Weissman, a California independent insurance agent, at a financial education and planning event where Weissman had an event booth. Weissman invited Frank to attend one of his seminars where he presented estate planning information to potential clients, including the use of life insurance as part of their plans. Frank was a real estate investor who, along with his wife Jean, owned and managed multi-unit rental properties in the San Francisco Bay area.

[¶3.]		Frank was concerned about protecting his estate and providing for Jean. Weissman explained a program whereby a high-value life insurance policy could be acquired on his life and the premiums paid via a loan obtained from a premium finance lender. In a letter to Frank and Jean, Weissman explained that the premium finance program made "a great deal of economic sense" as it enabled him "to buy as much life insurance as possible, without using [his] own funds to pay the premiums due." He explained that, through life insurance, Frank could protect his family by utilizing life insurance proceeds, which would provide liquidity to pay any estate taxes, without the family having to sell assets to do so. It would also provide Jean funds for unexpected emergencies or business expenses. He suggested that the life insurance be held in an irrevocable trust with Jean as the beneficiary so the proceeds would go to the trust for her benefit and support. When deposed in

the proceedings below, Weissman testified that he explained to Frank that premium financing programs permit an insured to obtain a nonrecourse loan to cover the cost of the policy premiums, without using the insured's own funds, for the first two years. The loan is collateralized solely by the policy. Thereafter, the borrower would have to post collateral to extend the financing and keep the policy in place. Weissman testified that premium financing was a very viable tool for clients, like Frank, who owned real estate assets that could be used as collateral to secure a loan, while using the income from such properties to pay the interest. He stated that most of the premium financing loans were set up for an 8 to 12 year period.

[¶4.]       Frank agreed to proceed and Weissman took steps to "shop" premium finance lenders in order to obtain a favorable rate for Frank, one of which was United National Funding, LLC (United). Frank submitted a loan application to United, and United approved Frank's application and sent a loan commitment letter outlining the terms. Among other things, United required the creation of a South Dakota irrevocable trust and the nomination of a South Dakota commercial bank, approved by United, as trustee.[1] The trustee would be the borrower on the loan and the sole owner of the life insurance policy held by the trust. Frank created

---

1.    Richard Kearns, a portfolio manager for New Stream Capital, LLC (New Stream), which served as a lender to United for its premium financing program, testified in his deposition that it was common for people to hold life insurance policies in an irrevocable life insurance trust for estate planning and other purposes. He also explained that the reason New Stream required a South Dakota trust is because of the absence of usury laws in South Dakota, which would allow a higher interest rate of 15 to 17 percent on the loan to account for the "riskiness of the collateral." Another reason, according to Kearns, was that South Dakota had less onerous requirements for obtaining a license to be a premium finance lender.

an irrevocable trust (Trust) and signed a trust agreement dated April 7, 2006 (Trust Agreement), which United provided. It identified Frank as the grantor, The First National Bank in Sioux Falls (FNB) as the Trustee, and Jean as the beneficiary of the Trust. The Trust Agreement was signed by Shawn Bolender, assistant vice president and trust officer at FNB, on April 14, 2006, and contains Frank's signature as grantor.[2] The Trust Agreement states that the Trust was created for the benefit of Jean as beneficiary. It "directs the Trustee to borrow funds from [United] pursuant to the Loan Documents" defined in the agreement, and "to use the proceeds therefrom to procure certain life insurance policies" and hold the policies in trust.

[¶5.] Also on April 14, 2006, Frank and the Trustee of his Trust applied for a $10 million life insurance policy (Policy) with MassMutual Life Insurance Company (MassMutual).[3] The application identified Frank's Trust as the proposed policy owner and beneficiary. It further stated Frank's annual earned income was "$100,000 +" and his financial net worth was "aprx 25 mil." This was generally consistent with the information MassMutual had received as part of its

---

2. Copies of three different documents, each entitled Irrevocable Trust Agreement, were produced in discovery in this case and presented to the circuit court. The first is an undated document that is not fully executed, as only Frank's signature appears; the latter two documents contain signatures of all parties. On appeal, as it did below, the Estate disputes the validity and existence of the Trust based primarily on its claim that Frank did not execute these latter two documents, which contain provisions not included in the earlier version.

3. In early 2006, Weissman assisted Frank in obtaining another $10 million life insurance policy issued by PHL Variable Life Insurance Company, which was funded through a different premium financing lender. This policy is not the subject of this appeal.

underwriting. The inspection report contained a health profile as well as Frank's financial profile indicating he had a net worth of $20,750,000, including significant real estate and cash assets, with no major liabilities. It also noted Frank's annual unearned income of $230,000 from rental properties and a pension. The report indicates that the investigator confirmed these figures with Frank's CPA.[4]

[¶6.]        The application indicated the primary purpose for the insurance was "Income for Dependents" and "Estate Taxes." In response to an inquiry in the application asking, "Are there any plans to sell the policy to another company after it is issued . . . ?," the "No" box was checked. Weissman testified during his deposition that Frank's intent when acquiring the policy was to protect his estate for estate planning purposes. He further testified the policy was never intended to be sold and that, prior to its issuance, Frank had not entered into any agreements to sell the policy.

[¶7.]        Preceding the signature lines on the application was an affirmation that "all statements made in this Part 1 are complete and true and were correctly recorded." The signature line was dated April 14, 2006, and the application was signed by Frank, Bolender on behalf of the Trustee, and Weissman as soliciting producer of the insurance policy. The application contains a final page with the heading "Producer Statement," which included the question, "Will loan proceeds, a loan of credit, or other financed funds be used to pay the premiums for this life

---

4.      There is some dispute about Frank's exact net worth. Although Frank's son Jerry, the special administrator of Frank's Estate, testified in his deposition that the figures reported in the inspection report regarding the value of Frank's assets and his net worth "sound[ed] true," Frank's other son Stephen believed Frank's assets were worth significantly less than $20 million.

insurance?" The "Yes" or "No" boxes were left blank. However, under the subheading "Producer Compensation," Weissman and Georgia Merkel, a representative working for United, are listed as producers, with a 50/50 commission split.[5] On the same date, Bolender, on behalf of the Trustee, signed a MassMutual Certification of Trust Agreement, certifying that the trust was "validly executed, and is in full force and effect[.]"

[¶8.] United provided various documents to facilitate the loan for the insurance premiums. This included a loan and security agreement also signed by Bolender on April 14, pledging the Policy as security for a $940,000 loan from United to finance the first two years of premiums (in the amount of $718,000) as well as other fees and costs related to the transaction. The term of the loan was seven years with a scheduled maturity date of May 25, 2013. The loan and security agreement included a requirement that the Trustee execute a collateral assignment and also granted United a limited power of attorney for the purpose of taking actions "as may be necessary to protect" United's "security interest and lien in the [c]ollateral" and to enforce United's rights and remedies in the event of a default. In May 2006, after approval of the loan, United paid the premiums and fees contemplated in the loan documents.[6]

---

5.    Merkel testified in her deposition that she did not receive any commissions personally; she signed them over to United. She agreed, when asked, that the reason United received part of the commissions was because the insurance policies were originated through United's premium finance program.

6.    New Stream provided United's funding for the premium finance loan. According to Kearns, United "would originate loans that were backed by

<span style="text-align:right;display:block">(continued . . .)</span>

[¶9.]     Thereafter, in the fall of 2006, First Bank & Trust (FB&T) in Sioux Falls was named successor Trustee of the Trust.[7] On September 22, 2006, FB&T executed a collateral assignment, on a MassMutual form document, that assigned certain rights and interests of the Trust in the Policy to United as collateral security for the loan. These included the right to collect the net proceeds of the Policy, to surrender the Policy and receive the surrender value, and the sole right to the value of funds held by the insurer for the purposes of paying future premiums. Certain rights were excluded from the assignment, including the right to designate and change the beneficiary of the Policy. United, as the assignee, agreed that any balance of sums received from the insurance company remaining after payment of the existing liabilities "shall be paid by the Company to the persons entitled thereto under the terms of the Policy had this assignment not been executed." This document was received by MassMutual in October 2006.

_____

(. . . continued)

policies of agents or others with whom [United] had a relationship." United compiled the documentation and submitted the loans for approval by New Stream's investment committee. New Stream also conducted a document review to ensure they met New Stream's criteria. Kearns described how this procedure involved a checklist which included whether there was an insurable interest, "in other words, is the insured taking this out on his own?" He further explained that they considered "whether there was a prearranged plan to sell it or whether [the insured] just had an option . . . to do whatever he wanted with it." Kearns testified that these loans "weren't meant to be loan to own." He acknowledged the "loan to own" concept existed in the realm of premium finance lenders, but he testified that New Stream's objective was simply to get paid back on the loan, including the interest "and whatever happened to the policy elsewhere really was none of our business."

7.     The circumstances relating to the removal of FNB as Trustee and the appointment of FB&T as successor Trustee are unclear. We hereafter use the term "Trustee" to refer to either FB&T or FNB, as Trustee of Frank's Trust, depending on the context.

[¶10.] In early 2008, Frank and Jean had discussions with William Noack, an insurance agent they had previously met in the summer of 2006 at one of Noack's estate planning seminars. According to Noack, they had expressed interest in obtaining another life insurance policy, and although Noack presented an offer to them, they were unable to proceed with a transaction because Frank lacked insurability given that he had already obtained two other $10 million life insurance policies. Frank told Noack he had taken out these policies to pay for future estate taxes. In January 2008, Noack corresponded with Frank to explore Frank's options with respect to the two policies for which the two years of premium financing would be expiring. Noack believed Frank's best alternative was to try to retain the Policy but also explained to Frank his other options, which included a sale of the Policy in the secondary market. Frank decided to authorize Noack to attempt to sell the Policy. Noack took steps to do so but was unsuccessful in obtaining a sale price offer that exceeded the loan balance.

[¶11.] Frank then reached out to Weissman indicating he was attempting to contact MassMutual to relinquish the Policy, but Weissman asked Frank to work with him to keep the Policy in force. Weissman explained, in his deposition, that he wanted Frank to "keep the policy and the planning" as they had originally discussed, as he believed it was in Frank's best interest. He further testified there were several options, including attempting to refinance the loan with Frank's own collateral, paying down the premiums with the cash value or other assets, or restructuring the Policy. Weissman's office corresponded via email with

MassMutual to confirm that the Policy had not lapsed and to find out how much time they had to try to refinance it or shop it in the life settlement market.

[¶12.] From June 2008 and over the course of the next year, New Stream, to whom United assigned its interest and rights in the Policy and loan obligations in November 2008, advanced an additional $784,865, which was used to pay the premiums for another 15 months. Ultimately, Frank decided, in 2009, to surrender the Policy to New Stream as satisfaction in full for all obligations due and owing on the loan. A July 2, 2009 letter from New Stream to the Trustee of the Trust memorializes Frank and the Trustee's offer to surrender the Policy, and New Stream's acceptance thereof, along with the terms of the surrender agreement, which was signed by Frank and the Trustee. The letter states that the Trustee understood that it had the options to satisfy the loan obligations by "(1) paying off the loan with personal or privately raised capital, (2) selling the Policy to an investor; and (3) arranging for refinancing through a third party[,]" but the Trustee instead elected to surrender the Policy. The surrender agreement contains language stating that "[t]he Policy was not purchased with the intent to sell, assign, or otherwise transfer the Policy or any other interests in or rights to the Policy or to any of its proceeds to any other person or entity[,]" and that, to the best of Frank's knowledge, the application for the Policy did not contain any untrue statements. Over the course of the three years and three months in which the Policy was held by the Trust, neither Frank nor the Trustee paid anything with regard to the Policy, nor is there any evidence that they received any compensation when obtaining or surrendering it.

[¶13.]      Thereafter, the Policy was sold and transferred to other entities, who continued to pay the premiums, until Viva purchased it in December 2014 and became the beneficial owner.  Over the next several years, Viva paid MassMutual $4,402,662 for the additional premiums to keep the Policy in force.  After Frank died on January 18, 2019, MassMutual paid the $10 million death benefit under the Policy, plus interest, to Viva's securities intermediary, Wilmington Trust, N.A. (Wilmington), which credited the payment to Viva's account.

[¶14.]      In January 2022, Frank's son, Jerry, as special administrator of the Estate, filed actions in federal courts claiming the Policy was void because it was procured by or payable to someone without an insurable interest in Frank's life and seeking recovery of the policy's $10 million death benefit.  Viva then filed this state court action against the Estate in May 2022, seeking a declaratory judgment that it is the rightful owner of the Policy's death benefits and that the Policy was validly issued and is enforceable.  The Estate answered and counterclaimed against Viva and Wilmington (hereafter collectively referred to as Viva), alleging the Policy, and United's premium financing, were part of a STOLI scheme that violated SDCL 58-10-3, South Dakota's insurable interest statute which precludes a person from procuring an insurance policy on the life of another, or causing such a policy to be procured, unless the benefits of the policy are payable, at the time the insurance contract was made, to a person who has "an insurable interest in the individual insured."  The Estate sought to recover the Policy proceeds from Viva pursuant to

SDCL 58-10-5, which entitles an insured's estate to maintain an action to recover policy proceeds if SDCL 58-10-3 was violated.[8]

[¶15.] Viva filed a motion to dismiss the counterclaim under SDCL 15-6-12(b)(5) on the grounds that Frank, through the Trust, procured the Policy on his own life and made the Trust the beneficiary; thus, the Policy was valid under the insurable interest statutes. In its oral ruling at the motion hearing, the circuit court stated, "I think the linchpin here is whether the benefits under the contract were payable to somebody with an insurable interest, some person, or trust, or at the time the contract was made, and I think it's undisputed that it was the case." The court entered an order granting the motion, concluding that the Policy beneficiary had an insurable interest in Frank's life at the time the Policy was issued.

[¶16.] Thereafter, Viva filed a motion for judgment on the pleadings, and the Estate filed a motion seeking to file two amended counterclaims. The circuit court denied Viva's motion and granted the Estate's motion to amend. In Count I, the Estate sought a declaratory judgment that the "Sham Trust" was void, invalid, and unenforceable at its inception because it lacked a lawful purpose in that it "was only created as a vehicle for United to wager on [Frank's] life." The Estate alleged that

---

8. SDCL 58-10-5 states:

> If the beneficiary, assignee, or other payee under any contract made in violation of § 58-10-3 receives from the insurer any benefits thereunder accruing upon the death, disablement, or injury of the individual insured, the individual insured or his personal representative, as the case may be, may maintain an action to recover such benefits from the person so receiving them.

Frank's consent to establish the Trust was obtained through fraud and undue influence by Weissman and that Frank had a diminished mental capacity. The Estate also alleged that the April 7, 2006 Trust Agreement relied on by Viva was not actually signed by Frank and that either Weissman or United appended Frank's signature from an earlier version of the agreement onto the later document.

[¶17.]     In Count II, the Estate sought recovery of the insurance proceeds pursuant to SDCL 58-10-5 due to the Policy lacking a valid insurable interest. It alleged that the Policy was procured by United as a wager on Frank's life and that United established the "Sham Trust" to feign compliance with the insurable interest statutes and to grant exclusive control of the Trust to United and Weissman. The Estate further alleged that the "Sham Trust" was used solely to act as the borrower of United's premium finance loan, the terms of which were designed and created "to conceal the fact that United was the ultimate lender, borrower, owner, and beneficiary of the Policy from day one."

[¶18.]     In its answer denying the Estate's claims, Viva asserted, among other defenses, that the Estate's amended counterclaims were barred by SDCL 55-4-57(a)(1), a statute of repose which precludes claims contesting the validity of a trust that are commenced later than one year after the settlor's death. Viva also asserted a defense that, to the extent the Policy is declared void, the Estate's recovery of any death benefit should be offset by the amount of the premiums Viva paid on the Policy to the insurer.

[¶19.]     The parties filed cross-motions for summary judgment. The circuit court held a hearing, and after an extensive colloquy with both counsel, the court

granted Viva's motion, and denied the Estate's motion, "in all respects." The court entered an order concluding that "the Estate's [a]mended [c]ounterclaims are barred by the statute of repose, SDCL 55-4-57(a)(1)." The court further ruled that Frank and the Trustee "created a valid and enforceable trust . . . under South Dakota law;" that the Estate's claims of "undue influence, fraudulent inducement, and lack of capacity [were] not supported by the evidence" and did "not present any genuine issues as to any material fact;" that the Policy "was validly issued and delivered to the Trust;" and that Viva was "entitled to retain the Policy's death benefit because the Policy complied with South Dakota's insurable interest requirements, as it was procured by [Frank] and/or the Trust, and, when the contract was made, the Policy's benefits were payable to the Trust, and ultimately [to Jean], both of whom had an insurable interest in" Frank's life. The court denied the Estate's motion for summary judgment for the same reasons. Thereafter, the court awarded Viva litigation costs in the amount of $30,284.76.

[¶20.]     On appeal the Estate raises several issues, which we have restated:

1.     Whether the circuit court erred when it determined that the statute of repose bars the Estate's amended counterclaims.

2.     Whether the circuit court erred when it determined that the Policy complied with the insurable interest statutes.

3.     Whether the circuit court abused its discretion when it awarded Viva costs and disbursements.

**Standard of Review**

[¶21.]     "We review a circuit court's entry of summary judgment under the de novo standard of review." *Harvieux v. Progressive N. Ins. Co.*, 2018 S.D. 52, ¶ 9, 915

N.W.2d 697, 700 (citation omitted). "Summary judgment is authorized under SDCL 15-6-56(c) 'if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'" *Scotlynn Transp., LLC v. Plains Towing & Recovery, LLC*, 2024 S.D. 24, ¶ 17, 6 N.W.3d 671, 676 (alterations in original) (quoting SDCL 15-6-56(c)). "Where the parties have filed cross-motions for summary judgment and the material facts are undisputed, 'this Court's review is limited to determining whether the circuit court correctly applied the law.'" *S.D. Bd. of Regents v. Madison Hous. & Redev. Comm'n*, 2025 S.D. 50, ¶ 31, 25 N.W.3d 541, 549 (quoting *Buchholz v. Storsve*, 2007 S.D. 101, ¶ 7, 740 N.W.2d 107, 110). "Issues involving matters of statutory interpretation and application are reviewed de novo." *In re Jones*, 2025 S.D. 54, ¶ 21, 26 N.W.3d 567, 573.

**Analysis and Decision**

[¶22.]     Before addressing the issues raised on appeal, we provide a synopsis of how the law relating to the insurable interest requirement has evolved. It is a well-established principle that a person may obtain life insurance on his own life. However, when life insurance is procured by someone other than the insured, the person to whom the benefits are payable must have an insurable interest in the life of the insured. As the United State Supreme Court explained long ago,

> [i]t is not easy to define with precision what will in all cases constitute an insurable interest . . . . But in all cases there must be a reasonable ground, founded upon the relations of the parties to each other, either pecuniary or of blood or affinity, to expect some benefit or advantage from the continuance of the life of the assured. Otherwise the contract is a mere wager, by which the party taking the policy is directly interested in the early death of the assured. Such policies have a tendency to create a desire for the event. They are, therefore, independently

> of any statute on the subject, condemned, as being against public policy.

*Warnock v. Davis*, 104 U.S. 775, 779 (1881).

[¶23.] As is the case in other states, South Dakota recognizes the insurable interest requirement, which the Legislature codified in SDCL 58-10-3:

> Any individual of competent legal capacity may procure or effect an insurance contract upon his own life or body for the benefit of any person. But no person shall procure or cause to be procured any insurance contract upon the life or body of another individual *unless the benefits* under such contract *are payable* to the individual insured or his personal representatives, or *to a person having, at the time when such contract was made, an insurable interest* in the individual insured.[9]

(Emphasis added.) The Legislature also defined who is considered to have an insurable interest in personal insurance contracts. SDCL 58-10-4. Relevant here, this includes "[i]nterests in individuals related closely by blood, marriage, or by law, a substantial interest engendered by love and affection." SDCL 58-10-4(1). Additionally, "[t]he trustee of a trust established by an individual settlor has an insurable interest in the life of that individual settlor[.]" SDCL 58-10-4(6).

[¶24.] Another relevant provision, SDCL 58-10-6.1, enacted in 1989, states in part:

> [A] person whose life is insured under a policy of life insurance may assign with his spouse's written consent any or all incidents of ownership granted him under the policy, including but not limited to any right to designate a beneficiary or to pay

---

9. Under the statute defining terms used in SDCL Title 58, a person is "an individual, insurer, company, association, organization, Lloyds, society, reciprocal or inter-insurance exchange, partnership, syndicate, business trust, corporation, and any other legal entity[.]" SDCL 58-1-2(14).

> premiums. If a policy of life insurance has been issued in conformity with this section, no transfer of the policy or any interest thereunder shall be invalid by reason of a lack of insurable interest of the transferee in the life of the insured or the payment of premiums thereafter by the transferee.

This statute reinforces the additional well-established principle that once a policy is validly acquired, a policy holder may assign it to another, even if the transferee lacks an insurable interest.[10] *See Grigsby v. Russell*, 222 U.S. 149, 156 (1911) (recognizing that an insurance policy is a form of investment and has "the ordinary characteristics of property" that is freely alienable).

[¶25.] Over time, a robust secondary market has developed which allows individuals who no longer wish to keep their life insurance policy to sell it for more

---

10. This principle may have been later qualified with the enactment, in 2015, of SDCL 58-10-17, which states:

> A person who has an insurable interest in the life of an individual settlor pursuant to subdivisions 58-10-4(1) to (6), may create an entity solely for the purpose of purchasing, holding, or administering an insurance contract on the life of the individual settlor. *Neither an insurance policy issued to the entity* nor any ownership interest in the entity itself *may be sold or voluntarily transferred to any entity other than one with an insurable interest in the life of the same individual settlor pursuant to subdivisions 58-10-4(1) to (6)*. For purposes of this section, entity, has the same meaning as the definition of, person, in subdivision 58-1-2(14).

(Emphasis added.) The emphasized language may conflict with language in SDCL 58-10-6.1. Although the Estate argued at the summary judgment hearing that, because of SDCL 58-10-17, Viva was never entitled to the proceeds, the circuit court noted that the statute was enacted after the relevant events here, including Viva's acquisition of the Policy in December 2014. On appeal, the Estate does not argue that the statute applies. Thus, we do not consider SDCL 58-10-17 in our analysis of how the governing law at the time of the disputed transactions applies to the facts before us.

than the cash surrender value; in such cases, the purchaser of the policy takes over payment of the policy premiums in exchange for receiving the death benefit when the insured dies. *See* Peter Nash Swisher, *Wagering on the Lives of Strangers: The Insurable Interest Requirement in the Life Insurance Secondary Market*, 50 Tort Trial & Ins. Prac. L.J. 703, 705 (2015); *see also* Susan Lorde Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 185−86 (2010). While such transactions, called life settlements,[11] are highly regulated and generally recognized as legal, the emergence of a subset of life settlements, called stranger-originated life insurance (STOLI), has led to controversy and is the subject of much regulation and litigation. *See PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1069−70 (Del. 2011) (*Price Dawe*); *see generally* Martin, *supra*, at 187−88, 197−216. As one court explained,

> [i]n a traditional life settlement, "investors purchase existing life insurance policies from insureds who no longer need the insurance to protect their families in the event of their deaths." [citation omitted]. In a STOLI arrangement, by contrast, "a life settlement broker persuades a senior citizen . . . to take out a life insurance policy"— not to protect the person's family but for a cash payment or some other current benefit[.]

---

11. Another type of transaction is a viatical settlement, which arose "in the 1980s in response to the AIDS crisis." *Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, 208 A.3d 839, 847 (N.J. 2019) (*Bergman*) (citation omitted). "In general, a viatical settlement is '[a] transaction in which a terminally or chronically ill person sells the benefits of a life-insurance policy to a third party' at a discounted value 'in return for a lump-sum cash payment.'" *Id.* (quoting *Black's Law Dictionary*, 1497 (9th ed. 2009)). "The market for viatical settlements later expanded to include policies for the elderly and people with diseases other than AIDS." *Id.* (citation omitted); *see* Susan Lorde Martin, *Betting on the Life of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 186 (2010).

*Sun Life Assurance Co. of Canada v. Wells Fargo Bank., N.A.*, 208 A.3d 839, 848 (N.J. 2019) (*Bergman*) (third alteration in original) (quoting Martin, *supra*, at 187). "A key difference between non-STOLI and STOLI policies . . . is simply one of timing and certainty; whereas a non-STOLI policy might someday be resold to an investor, a STOLI policy is intended for resale before it is issued." *Id.* (citation modified).

[¶26.]      In this case, the Estate alleges the Policy was procured via a STOLI arrangement and was thus an impermissible wager contract on Frank's life that did not comply with South Dakota's insurable interest statute, SDCL 58-10-3.  Thus, the Estate contends it was entitled under SDCL 58-10-5 to recover the death benefits that MassMutual paid to Viva upon Frank's death, and that the circuit court erred in concluding otherwise.  It also contends the court erred when it held that the Estate's amended counterclaims are barred by the statute of repose in SDCL 55-4-57(a)(1).  Because this latter issue is dispositive on several of the arguments the Estate asserts in this appeal, we begin with an analysis of the statute of repose.

### 1.  *Whether the circuit court erred when it determined that the statute of repose bars the Estate's amended counterclaims.*

[¶27.]      On appeal, the Estate acknowledges that an insurable interest under SDCL 58-10-4(6) includes the interest a "trustee of a trust established by an individual settlor" has in the life of the individual settlor.  The Estate argues, however, that no such insurable interest existed in this case.  According to the Estate, the Trust was not properly established because Frank signed only the first

trust agreement and never saw or signed the later trust agreement documents. The Estate further contends that the Trust did not have a lawful purpose as required by South Dakota's trust laws, but instead it was simply a "cover for a wager" and an artifice to "feign technical compliance" with the insurable interest laws.

[¶28.] As it did below, Viva argues that the Estate's amended counterclaims involving the Trust were barred by the statute of repose in SDCL 55-4-57. Under SDCL 55-4-57(a)(1), "[a] judicial proceeding *to contest whether . . . an irrevocable trust was validly created* may not be commenced later than . . . [o]ne year after the settlor's death[.]" (Emphasis added.) Frank died on January 18, 2019. The Estate filed its answer and counterclaim on June 10, 2022 and filed its amended counterclaims on February 23, 2023, well past the one-year deadline. The Estate contends that SDCL 55-4-57(a)(1) has no application here because it pertains only to "contests" over the distribution of trust property, and not to challenges seeking recovery of insurance proceeds under SDCL 58-10-5.[12] According to the Estate, there is no time limitation in which such an action seeking recovery of insurance proceeds under SDCL 58-10-5 may be brought by an insured or personal representative.

[¶29.] We first dispense with the Estate's argument that "defensive counterclaims cannot be time barred so long as the plaintiff's cause of action was

---

12. The Estate also argues that because SDCL 55-4-57(a)(1), which was enacted in 2010 and amended in 2013, was not in effect at the time the Trust was created, this statute cannot be applied retroactively to preclude a challenge to the Trust's validity. Because the Estate did not raise this retroactivity argument below, it is not preserved for appeal and we therefore do not address it. *Hauck v. Clay Cnty. Comm'n.*, 2023 S.D. 43, ¶ 4 n.4, 994 N.W.2d 707, 709 n.4.

itself timely." The Estate's counterclaims asserting that the Trust was invalid seek affirmative relief in the form of a declaratory judgment and recovery of proceeds under SDCL 58-10-5. We have held that "counterclaims seeking affirmative relief are 'actions' subject to" time-based limitation laws. *Murray v. Mansheim*, 2010 S.D. 18, ¶ 8 n.1, 779 N.W.2d 379, 383 n.1.

[¶30.] "A statute of repose bars all actions after a specified period of time has run from the occurrence of some event other than the occurrence of an injury that gives rise to a cause of action." *In re Wintersteen Rev. Tr. Agreement*, 2018 S.D. 12, ¶ 26, 907 N.W.2d 785, 793 (citation omitted). "Put simply, 'statutes of repose effect a legislative judgment that a defendant should be free from liability after the legislatively determined period of time.'" *Id.* (citation omitted). We have held that "SDCL 55-4-57(a)(1) operates as a statute of repose." *Id.* ¶ 27; *see In re Shirley A. Hickey Living Tr.*, 2022 S.D. 53, ¶ 22, 979 N.W.2d 558, 565. The statute "bars claims contesting the validity of revocable and irrevocable trusts one year after the settlor's death, regardless of when the injury arose or when the person received notice." *In re Elizabeth A. Briggs Rev. Living Tr.*, 2017 S.D. 40, ¶ 9 n.5, 898 N.W.2d 465, 469 n.5; *see Wintersteen*, 2018 S.D. 12, ¶ 27, 907 N.W.2d at 793 (quoting *Briggs*).

[¶31.] Contrary to the Estate's contention, nothing in the statute limits its application to challenges relating to the distribution of trust property. "When we interpret legislation, we 'cannot add language that simply is not there.'" *Olson v. Butte Cnty. Comm'n*, 2019 S.D. 13, ¶ 10, 925 N.W.2d 463, 466 (citation omitted). This would include claims based on the formalities involved in creating a trust, as

well as challenges relating to the trustor's intentions in creating it. *See Briggs*, 2017 S.D. 40, ¶ 10, 898 N.W.2d at 469−70. In essence, SDCL 55-4-57(a) applies to any claims that would "negate the valid creation of trusts[.]" *Id.* (holding that the statute of repose applied to claims alleging lack of capacity and undue influence, as they pertain to the trustor's intention to create a trust).

[¶32.] Here, the Estate's claims relating to the alleged fraud in appending Frank's signature to a Trust Agreement and whether the Trust was established for an unlawful purpose are challenges to whether the Trust was validly created. The Estate's claims challenging the validity of the Trust are therefore barred by the statute of repose because they were brought more than one year after Frank's death. The circuit court did not err when ruling in favor of Viva on this issue.

### 2. *Whether the circuit court erred when it determined that the Policy complied with the insurable interest statutes.*

[¶33.] Although both of the Estate's amended counterclaims centered on the alleged invalidity of the Trust, the Estate maintains that the statute of repose does not bar its second counterclaim for recovery of the insurance benefits paid out on Frank's Policy under SDCL 58-10-5. The Estate contends that notwithstanding the apparent facial compliance with SDCL 58-10-3, the Policy was procured via a STOLI arrangement and was thus invalid. The Estate requests that we examine the substance of the transaction, not merely its form. In response, Viva maintains that the circuit court correctly interpreted and applied the plain meaning of SDCL 58-10-3 when determining that the Policy complied with the insurable interest requirements. Viva further asserts that even if we scrutinize the substance of the

transactions at issue, what transpired here was not a STOLI scheme. Both parties assert that undisputed material facts support their claims. We begin with an analysis of the governing statutes and their application to the question before us.

[¶34.]     "Resolving an issue of statutory interpretation necessarily begins with an analysis of the statute's text." *Lapin v. Zeetogroup, LLC*, 2025 S.D. 36, ¶ 10, 24 N.W.3d 541, 545 (citation omitted). "When the language in a statute is clear, certain, and unambiguous, there is no reason for construction, and this Court's only function is to declare the meaning of the statute as clearly expressed." *Id.* (citation omitted). Furthermore, "we determine the intent of a statute 'from what the Legislature said, rather than what [we] think it should have said, and . . . must confine [ourselves] to the language used.'" *Long v. State*, 2017 S.D. 78, ¶ 13, 904 N.W.2d 358, 364 (alterations in original) (citation omitted).

[¶35.]     As we have previously noted, SDCL 58-10-3 allows an individual to "procure" an insurance policy on his own life "for the benefit of any person." However, the second sentence of the statute makes it clear that "no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his personal representatives, or to a person having, at the time when such contract was made, an insurable interest in the individual insured." SDCL 58-10-3.

[¶36.]     The parties offer different interpretations of the term "procure" as it is used in SDCL 58-10-3 and applied to the facts here. The Estate claims the term narrowly refers to who paid the premiums and thus asserts that United procured

the Policy or caused it to be procured. Viva asserts a broader definition and contends the plain meaning of "procure" is to obtain or get something. Viva asserts that Frank procured the Policy through the Trustee of his Trust by submitting an application and related documents, engaging in the underwriting process, and obtaining a loan to pay for the premiums. But regardless of how the term procure is interpreted, under the plain language of the remainder of the statute, even if someone without an insurable interest procured the Policy or caused it to be procured, so long as the Policy benefits were payable "to a person having, at the time when such contract was made, an insurable interest in" Frank's life, SDCL 58-10-3 is satisfied. It is undisputed that, at the time the Policy was issued and went into effect, the death benefits were payable to the Trust as beneficiary of the Policy, and ultimately, to Jean as beneficiary of the Trust. By definition, both Jean and the Trustee had an insurable interest in Frank's life. SDCL 58-10-4(1), (6). Based on the clear and unambiguous language of the statute, the circuit court correctly determined that the Policy complied with the terms of the insurable interest statutes.

[¶37.] The circuit court did not enter a specific ruling on the Estate's claim that, regardless of the facial compliance with the statute, the transactions and circumstances surrounding the procurement, assignment, and relinquishment of the Policy show that this was instead an unlawful STOLI scheme that violated the insurable interest statute and the public policy against wagering on human life. However, during its lengthy colloquy with the parties during the summary judgment hearing, the court recognized that SDCL 58-10-6.1 allows a person whose

life is insured via a lawfully issued life insurance policy to thereafter assign the policy to a person without an insurable interest. Indeed, this statute highlights the tension between two public policies that are at issue here. *See* Robert S. Bloink, *Catalysts for Clarification: Modern Twists on the Insurable Interest Requirement for Life Insurance*, 17 Conn. Ins. L.J. 55, 82 (2010) (observing that "[i]n tension with the insurable interest requirement is the well-settled principle that a life insurance policy is freely transferrable once the policy is validly issued. . . . to any person, including someone without an insurable interest"); *Grigsby*, 222 U.S. at 156 (noting "it is desirable to give to life policies the ordinary characteristics of property" and that "[t]o deny the right to sell except to persons having [an insurable] interest is to diminish appreciably the value of the contract in the owner's hands"). The case before us presents a question of first impression, as this Court has not previously addressed whether an insurance policy facially complying with our statutes should nevertheless be invalidated if a court determines it was issued via a STOLI scheme.

[¶38.] There is a wide body of commentary regarding the circumstances that differentiate a lawful life settlement contract from a STOLI scheme. These secondary sources identify some of the features that are often indicative of a STOLI arrangement.[13] These include the fact that the transaction is initiated by someone

---

13. Our general overview of typical features of STOLI schemes is gleaned from the following secondary authorities: Robert S. Bloink, *Catalysts for Clarification: Modern Twists on the Insurable Interest Requirement for Life Insurance*, 17 Conn. Ins. L.J. 55, 79–82 (2010); Peter Nash Swisher, *Wagering on the Lives of Strangers: The Insurable Interest Requirement in the Life Insurance Secondary Market*, 50 Tort Trial & Ins. Prac. L.J. 703, 733−34 (2015); *and* Martin, *Betting on the Life of Strangers*, 13 U. Pa. J. Bus. L. at 187−88.

other than the insured—typically a broker, agent, investor, or other third party—

who offers incentives to a person considering whether to purchase life insurance,

such as a lump-sum payment for obtaining a life insurance policy, a partial

payment of policy proceeds, or what is described as "free" life insurance for the

duration of the insurer's contestability period.[14]  The insureds are generally unable

to pay the premiums for the high-dollar policy so they are typically paid through

premium financing via a nonrecourse loan from a lender associated with the

program.  The insurance policy is then assigned to the lender as collateral for the

loan.  Another common feature is the creation of an irrevocable trust naming the

insured's spouse or another family member as the beneficiary of the trust, and the

trustee is chosen by the premium finance lender.  The trust is the borrower of the

loan and the owner and beneficiary of the insurance policy through which the

premiums are typically paid.  Such an arrangement allows the lender to maintain

control of the policy and obscure the fact that the premiums are being paid by a

third-party investor.  From the outset, the insured intends to hold the policy only

for the two-year contestability period.  But after that point, the insured typically

has three options to: (1) pay off or refinance the loan; (2) sell the policy on the

secondary market; or (3) surrender the policy to the lender, who then sells it on the

secondary market.  Because the first option is typically not realistic for most

---

14.  After issuing a policy, an insurer has only a certain period of time, typically
     two years, in which it may investigate the application and contest the validity
     of the policy.  After this period, the policy is incontestable by the insurer
     except for nonpayment of premiums or fraud by the applicant or insured.
     *See, e.g.*, SDCL 58-15-10 (requiring a life insurance policy to contain a two-
     year incontestability provision).

insureds, given the high premiums and the insured's lack of assets to pay or refinance the loan, the policy is most often relinquished to the lender.

[¶39.]        Courts in other jurisdictions have addressed the issue of whether an insurance policy should be declared void because it was procured via a STOLI scheme. Each case turns, of course, on an analysis of that state's laws and the particular facts at issue. In many of the cases involving variations of the circumstances identified in the secondary sources above, courts have determined that, despite what appears to be facial compliance with the insurable interest requirement, the policy at issue was invalid because it was procured via a STOLI scheme as a means for an investor to acquire an insurance policy on a person's life for which the investor has no insurable interest. *See Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, 44 F.4th 1024, 1034−35 (7th Cir. 2022) (determining that a life insurance policy was an illegal wager on the insured's life, after considering the substance of the transactions related to the purchase of the policy, including a premium financing arrangement designed to be concealed from the insurer); *Bergman*, 208 A.3d at 841 (determining that, although a life insurance policy appeared to satisfy the insurable interest requirement, the intent from the outset was to transfer it to strangers; the court noted that "[i]t would elevate form over substance to conclude that feigned compliance with the insurable interest statute—as technically exists at the outset of a STOLI transaction—satisfies the law"); *Price Dawe*, 28 A.3d at 1078 (concluding that a policy lacks an insurable interest "where a third party . . . funds the premium payments as part of a pre-negotiated arrangement with the insured to immediately transfer ownership").

[¶40.]     Other courts, however, have declined to declare an insurance policy invalid, given the apparent compliance with the state's insurable interest laws at issue. *See PHL Variable Ins. Co. v. Bank of Utah*, 780 F.3d 863, 869−70 (8th Cir. 2015) (noting that, under Minnesota common law, the insurable interest requirement was satisfied when an insured purchased a policy on his own life, even though the policy was later assigned to an investor); *Principal Life Ins. Co. v. DeRose*, 2011 WL 4738114 *7 (M.D. Pa. October 5, 2011) (concluding that the insured's irrevocable trust, named as the beneficiary of the policy at its inception, had an insurable interest as a matter of law and further noting that Pennsylvania's insurable interest statute, which contains language that is identical to the transfer language in SDCL 58-10-6.1, "is quite different from insurance statutes in many other states because it expressly authorizes transfers of policies that are properly issued"); *Lincoln Nat'l Life Ins. Co. v. Gordon R.A. Fishman Irrev. Life Tr.*, 638 F. Supp. 2d 1170, 1179 (C.D. Cal. 2009) (*Fishman*) (declining to invalidate an insurance policy that was initially held by the insured's trust and later surrendered to the lender that financed the premiums, noting that the arrangement was permissible under the law in existence at the time).[15]

[¶41.]     The Estate, when urging this Court to apply a similar analysis as in the cases declaring a facially compliant policy to be an unlawful STOLI scheme, points to cases in which we have scrutinized contractual agreements that appear to effect a lawful objective to determine if the true nature of the transaction violates

---

15.     After *Fishman* was decided, the California legislature amended the law to prohibit STOLI arrangements. *See Bergman*, 208 A.3d at 856 (citing Cal. Ins. Code §§ 10113.1(g)(1)(B), 10113.3(s)).

public policy. *See Waite v. Frank*, 86 N.W. 645 (S.D. 1901) (addressing whether a promissory note and mortgage were bona fide transactions for the purchase of commodities on margins, as opposed to an unlawful gambling contract in which the parties agreed that no delivery of grain or provisions would occur, making the feigned purchases mere bets on the future state of the commodities market); *Neve v. Davis*, 2009 S.D. 97, 775 N.W.2d 80 (reinstating a jury verdict that a promissory note was void because part of the consideration of the contract was for the repayment of a gambling debt). In a more recent case, we similarly determined that what appeared to be an executed transfer of real estate was instead, in essence, an equitable mortgage subject to the public policy ensuring that a debtor has a right of redemption. *See Sturzenbecher v. Sioux Cnty. Ranch, LLC*, 2025 S.D. 24, 20 N.W.3d 419. However, these cases did not involve the unique and highly regulated area of life insurance policies. And none of these cases required us to consider and apply two public policies codified by our Legislature that are sometimes in tension—the requirement of an insurable interest at the time a policy is obtained and the recognized property right to transfer the policy to someone without an insurable interest thereafter—and the fine, and sometimes difficult, line that must be drawn between the two when evaluated in distinct scenarios.

[¶42.] The determination of whether a transaction is a lawful life settlement transaction or an unlawful STOLI arrangement may turn on several factors which may be common to both scenarios. As noted in *Bergman*, there are a number of considerations that impact whether an insurance policy is valid, including, among others, "the nature and timing of any discussions between the purchaser and the

strangers; the reasons for the transfer; and the amount of time the policy was held[.]" 208 A.3d at 851. For example, "[i]f the purchaser and investors discussed an arrangement *in advance*, a third party without an insurable interest may have caused the policy to be procured[,]" and "the less time the policy owner held the policy before transferring it to a stranger, the greater the likelihood the policy violates public policy." *Id.* at 851–52 (emphasis added). The court observed that if a "bright-line rule" cannot be drawn for some scenarios, "[t]he area is best addressed by the Legislature[.]" *Id.* at 852.

[¶43.]    The *Bergman* court then noted that 30 states had enacted anti-STOLI legislation.[16] *Id.* (providing a list of the particular statutes and states which had

---

16.    Many states have passed anti-STOLI legislation containing language similar to that found in Georgia's statute, which defines a STOLI policy as follows:

> "Stranger originated life insurance" is a series of acts or a practice to initiate a life insurance policy for the benefit of a third-party investor who, at the time of policy origination, has no insurable interest in the insured. Stranger originated life insurance acts or practices include, but are not limited to, cases in which life insurance is purchased with resources or guarantees from or through a person or entity who, at the time of policy inception, could not lawfully initiate the policy himself or herself or itself, and where, *at the time of inception, there is an arrangement or agreement to directly or indirectly transfer the ownership of the policy or the policy benefits to a third party.* Trusts that are created to give the appearance of insurable interest and are used to initiate policies for investors violate insurable interest laws and the prohibition against wagering on life. Stranger originated life insurance arrangements do *not* include those practices set forth in subparagraph (C) of paragraph (11) of this Code section.

Ga. Code Ann. § 33-59-2(24) (emphasis added). The practices that are *not* deemed STOLI arrangements, as identified in the reference to Ga. Code Ann. § 33-59-2(11)(C) addressing life settlement contracts, include premium

(continued . . .)

enacted them). South Dakota was not one of them, nor was New Jersey.[17]

However, the court gave considerable weight to the view of the New Jersey

Department of Banking and Insurance, expressed in an amicus brief, that a STOLI

scheme in which a third party "procure[s] a life insurance policy . . . with the intent

to benefit persons without an insurance interest in the insured" violates public

policy. *Id.* at 853. The court ultimately declared the transaction at issue in

*Bergman* to be an unlawful STOLI scheme and when doing so, it noted that New

Jersey did not have a statute like those in other states allowing an immediate

transfer of a lawfully procured insurance policy to one without an insurable

interest. *Id.* at 855−856 (citing cases where the courts declined to declare a policy

void despite the presence of features consistent with a STOLI scheme based on the

language of then-existing statutes seeming to condone such policies).

[¶44.] Based on the undisputed facts here, many features of the transactions

related to the Policy procured on Frank's life align with a typical STOLI scheme—

initial nonrecourse premium financing, the formation of an irrevocable trust with a

trustee named by the lender, a collateral assignment of the policy to the lender, and

a relinquishment of the policy to the lender after the nonrecourse financing has

_____

(. . . continued)

    finance loans, "provided that neither default on such loan nor the transfer of the policy in connection with such default is pursuant to an agreement or understanding with any other person for the purpose of evading regulation under this chapter[,]" as well as collateral assignments of a life insurance policy by an owner.

17.    After *Bergman*, in 2020 the New Jersey Legislature enacted legislation specifically defining and prohibiting STOLIs. *See* N.J. Stat. Ann. § 17B:30B-18.

been exhausted. However, the central focus in the anti-STOLI legislation and the rulings by courts addressing this issue is whether there was an agreement and intention by the parties, *from the inception*, to transfer the life insurance policy to the third party that was instrumental in procuring the policy. *See* Bloink, *supra* ¶ 37, at 79; Swisher, *supra* ¶ 25, at 724; *see also Lincoln Nat. Life Ins. Co. v. Calhoun*, 596 F. Supp. 2d 882, 890 (D. N.J. 2009) (noting that issues of intent are "crucial" to whether a policy is void due to a lack of insurable interest). Here, the evidence produced by the parties includes undisputed facts that distinguish this case from others in which courts determined that a life insurance policy was procured via an unlawful STOLI scheme, including facts supporting a determination that there was no intent to transfer the Policy at the outset.

[¶45.]        For example, there is no evidence that Frank ever received an upfront payment or any other type of financial compensation thereafter in exchange for his participation in the transaction. And unlike the insureds in typical STOLI cases, Frank had a considerable net worth consisting largely of real estate assets. Thus, Frank's financial situation was such that he may have had a legitimate need for life insurance to facilitate the payment of estate taxes, and both Weissman and Noack testified that this was Frank's intent in seeking the Policy. Given Frank's considerable real estate assets, he may have been better postured than others to refinance the loan with his own collateral. Also, the premium financing from United was in the form of a seven-year loan, which differs from many of the loans in a STOLI transaction that mature shortly after the two-year contestability period. Importantly, unlike some STOLI schemes where the insurer is kept unaware of the

use of premium financing, that is not the case here, as evidence in the record demonstrates that MassMutual knew, within the first year after the Policy was issued, of United's involvement. This includes MassMutual's receipt of the September 2006 collateral assignment in favor of United, as well as its receipt, in March 2007, of a copy of Frank's Trust Agreement directing the Trustee to obtain premium financing from United. As in *Fishman*, here the collateral assignment only entitled United to the portion of the Policy proceeds needed to satisfy the liabilities under the loan and security agreement. *See Fishman*, 638 F. Supp. 2d at 1179 (noting the "critical distinction" that the collateral assignment in the case "was limited to that of a secured creditor, not an owner or absolute assignee").

[¶46.]      Additionally, it is also significant and undisputed that no immediate transfer of the Policy to United's successor New Stream occurred after the initial two-year nonrecourse premium financing period ended. Frank made considerable efforts through Noack, an insurance agent unconnected to the procurement of Frank's Policy, to sell the Policy—a perfectly valid incident of ownership of a life insurance policy—rather than immediately relinquishing it to United or its successor, New Stream. Moreover, New Stream continued to advance financing for more than another year for the payment of premiums. As a result, for over three years, the Policy proceeds, minus the amount due under the premium financing loan, would have been payable to Frank's Trust, with Jean as its beneficiary.

[¶47.]      Although we are not blind to the concerns relating to established STOLI schemes, as the court noted in *Bergman*, where there are scenarios in which "[c]ourts cannot devise a bright-line rule," the matter "is best addressed by the

Legislature[.]" 208 A.3d at 852. Given the circumstances present in this case, we address the question before us by applying the unambiguous governing statutes that existed at the time of the relevant events at issue to the undisputed facts before us. At the time the Policy was issued, it complied with SDCL 58-10-3 because the benefits were payable to a person with an insurable interest in Frank's life, as defined in SDCL 58-10-4. And, under SDCL 58-10-6.1, there was nothing unlawful about the later transfer of the Policy to New Stream. We therefore conclude that the circuit court did not err in denying summary judgment to the Estate and granting summary judgment to Viva on the issue of whether the Policy complied with our insurable interest statutes.

### 3. Whether the circuit court abused its discretion when it awarded Viva costs and disbursements.

[¶48.] The Estate argues that Viva failed to provide justification for the individual expenses the circuit court awarded to Viva, pursuant to SDCL 15-6-54(d), as the prevailing party. The Estate contends that $29,834.19 of the total awarded was for what it termed "non-authorized deposition costs" that are not statutorily authorized, citing *McLaren v. Sufficool*, 2015 S.D. 19, 862 N.W.2d 557 and *DeHaven v. Hall*, 2008 S.D. 57, 753 N.W.2d 429. In response, Viva argues, as it did below, that its application for costs and supporting documentation satisfied SDCL 15-17-37 and the costs were justified to defend against the Estate's amended counterclaims. We review a circuit court's award of disbursements for an abuse of discretion. *McLaren*, 2015 S.D. 19, ¶ 4, 862 N.W.2d at 558.

[¶49.] As the prevailing party, Viva submitted a sworn application to the circuit court requesting taxation of costs in the amount of $44,192.26, pursuant to

SDCL 15-6-54(d) and SDCL 15-17-37, which included an itemized list with attached invoices and billing records supporting each item.  The Estate filed objections asserting that Viva failed to explain why certain witness and deposition expenses were necessary or why the award of such costs was justified.  Viva filed a brief in response, detailing reasons why the depositions were necessary to respond to the Estate's counterclaims and why an award of fees is justified.  Thereafter, the court sent an email to counsel stating that, in light of the 2021 amendments to SDCL 15-17-37, the court "must disallow the technology fees, cancellation fees and video service and videographer fees.  The remaining disbursements are approved."

[¶50.]	Viva then submitted a second supplemental sworn declaration that purportedly removed requested costs disallowed by the circuit court.  For the costs it was still seeking, Viva's declaration listed the date, description of service, category of those services, and the dollar amount requested.  The entries consisted of a filing fee, witness and mileage fee, hearing transcript fees, as well as "witness and deposition fees" related to various depositions.  The declaration relied on the invoices Viva previously submitted.  The court then entered an order and judgment granting the Estate's objections in part and overruling them in part.  The court sustained the Estate's objections to Viva's request "for technology, cancellation, video service, and videographer fee disbursements," overruled "the Estate's objections as to other categories of costs," "approved the remaining disbursements," and ordered the Estate to pay Viva $30,284.76 in taxable costs.

[¶51.]	Under SDCL 15-17-37,

> The prevailing party in a civil action or special proceeding may recover expenditures necessarily incurred in gathering and

procuring evidence or bringing the matter to trial. Such expenditures include costs of telephonic hearings, costs of telephoto or fax charges, fees of witnesses, interpreter or translator expenditures not otherwise covered pursuant to § 15-17-37.1, officers, printers, service of process, filing, expenses from telephone calls, copying, costs of original and copies of transcripts and reporter's attendance fees, and court appointed experts. These expenditures are termed "disbursements" and are taxed pursuant to § 15-6-54(d).

[¶52.] We have held that circuit courts should "allow only those disbursements 'specifically authorized by [SDCL 15-17-37].'" *DeHaven*, 2008 S.D. 57, ¶ 48, 753 N.W.2d at 444 (alteration in original) (citation omitted) (noting that "the statutory language of the enumerated items . . . has been followed 'word for word'" and that the Court has disallowed other various fees and costs requested in prior cases (citations omitted)). However, in so holding, we acknowledged the phrase at the end of the list of allowed expenditures (which no longer exists in the current statute) referring to "other similar expenses and charges." *Id.* ¶¶ 49−51, 753 N.W.2d at 444−45 (applying version of SDCL 15-17-37 then in effect). Applying the same version of SDCL 15-17-37 analyzed in *DeHaven*, in *McLaren* we addressed deposition-related expenses and determined that "videographer fees for recording depositions" are awardable, as they are "'of the same general kind' as costs of . . . transcripts and reporter's attendance fees for depositions." 2015 S.D. 19, ¶ 9, 862 N.W.2d at 560 (alteration in original) (quoting *DeHaven*, 2008 S.D. 57, ¶ 52, 753 N.W.2d at 445). But we further noted that such expenses must still meet the other requirement in SDCL 15-17-37 that they were "necessarily incurred in gathering and procuring evidence or bringing the matter to trial." *Id.* ¶ 10 (quoting SDCL 15-

17-37). We then remanded the matter so that the circuit court could enter findings of fact regarding the necessity of the video costs. *Id.* ¶ 12, 862 N.W.2d at 561.

[¶53.] In 2021, the Legislature amended SDCL 15-17-37 and removed the "other similar expenses and charges" language. *See* 2021 S.D. Sess. Laws, ch. 87, § 1. The circuit court here deemed this enactment to be a legislative repeal of the *McLaren* ruling, as it relates to the allowance of video deposition costs. The court therefore disallowed Viva's request for deposition-related expenses such as "technology fees, cancellation fees, and video service and videographer fees," based on the view that only the enumerated items in SDCL 15-17-37—costs of original and copies of transcripts and reporter's attendance fees—can be awarded. Viva has not appealed this determination.

[¶54.] With respect to the Estate's challenge to the expenses in Viva's second supplemental declaration, it appears, from the supporting invoices, that some of the deposition-related expenses that the circuit court awarded may not conform with the court's order regarding what fees were denied under the current version of SDCL 15-17-37. One such expense that clearly did not conform with the court's order is the January 21, 2025 invoice in the amount of $905 for the David Lutrey deposition, for "remote video recording." Other invoices may also contain deposition-related expenses that go beyond a transcript copy and reporter attendance fee and may be indicative of technology or other fees that the court denied. For example, there are fees for "Realtime Text Stream – Remote Connection," a "Realtime Connectivity Fee," and "video pages." Because it is not clear, from the current record, whether some of these other fees would fall under the

umbrella of "technology fees, cancellation fees, and video service and videographer fees," we reverse the award of video recording fees for the Lutrey deposition, and we remand for a determination whether some of these other additional fees were erroneously included in the taxable costs the court awarded.

## Conclusion

[¶55.] We affirm the circuit court's order granting Viva's motion for summary judgment and denying the Estate's motion, but reverse, in part, the cost award and remand for further proceedings on that issue consistent with our decision.

[¶56.] JENSEN, Chief Justice, and SALTER, MYREN, and GUSINSKY, Justices, concur.